# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| **EQUAL EMPLOYMENT OPPORTUNITY COMMISION**, | ) <br> ) <br> ) |
| Plaintiff, | ) <br> ) |
| vs. | )    **CIVIL ACTION NO. 18-0416-CG-N** <br> ) |
| **AUSTAL USA, LLC,** | ) <br> ) <br> ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant's motion for summary judgment and memorandum in support (Docs. 77, 78), Plaintiff's opposition thereto (Doc. 86), Defendant's motion to strike (Doc. 87), Defendants' reply in support of summary judgment (Doc. 88), and Plaintiff's opposition to the motion to strike (Doc. 91). For reasons which will be explained below, the Court finds that Defendant's motion to strike should be denied, but that Defendant's motion for summary judgment should be granted.

## FACTS

This case is brought by the EEOC alleging that Defendant, Austal USA, LLC, ("Austal") has an attendance policy which does not consistently provide for reasonable accommodation of qualified individuals with disabilities and which instead provides for termination of their employment in violation of sections 102(a) and 102(b) of Title I of the ADA, 42 USC §§ 12112(a) and (b)(5)(A). (Doc. 1 PageID.3). The EEOC's allegations are based on claims of the "charging party,"

Jimmy Cooper, who began working for Austal in 2007. The complaint alleges that Austal discriminated against Cooper by failing to provide him leave as a reasonable accommodation and instead terminating his employment for disability-related absences.

At the relevant times of this action Cooper worked as a Logistics Associate II. Cooper's duties were "[t]o receive, inspect, inventory, handle, move, issue, kit and deliver materials in a safe, accurate and efficient manner." (Doc. 79-1 PageID.936). The position required Cooper to be present at the facility to do the work – it could not be done from home. (Doc. 79-1 PageID.852). Cooper worked the 6:00 a.m. to 2:30 p.m. shift and reported to supervisors Carlos Walker and Mike Leachman, who in turn, reported to Foreman Calvin Lett. (Doc. 79-1 PageID.853-854).

Cooper was diagnosed with diabetes in 2008. (Doc. 79-1 PageID.856). Cooper was treated by Drs. Rex Rawls, Amy Strassburg and Edward Carlos (Doc.79-1 PageID.858). Cooper's diabetes was uncontrolled, based on his A1C. (Doc.79-15 PageID.1808-1809). According to Dr. Strassburg, Cooper could perform his job duties "on a good day," but could not perform his job duties when his sugar was off, and it would be difficult to predict when he would have a good day. (Doc. 79-15 PageID.1812). Cooper had very labile sugars – they were very inconsistent and difficult to control, and no matter what insulin he was prescribed he would have super highs and super lows -partly due to his variant of diabetes and partly due to noncompliance. (Doc.79-15, PageID.1815-1817). Dr. Carlos testified that Cooper's

diabetic condition would require him to be absent from work intermittently. (Doc. 79-16 PageID.1865). Cooper would be expected to need to maintain a flexible schedule – unpredictably needing to come in late and leave early at unpredictable times. (Doc. 79-16 PageID.1866). How long an episode would last or when it would occur could not be anticipated. (Doc. 79-16 PageID.1865). Dr. Strassburg testified that during the 2014/2015 time period, Cooper was having low or high blood sugar more than just once or twice a week ...

> And he and I were both getting frustrated and trying to come up with all kinds of ways to literally save his life. He was a danger at that point. His sugar was going up and down and his inability to control them and lack of understanding and lack of medication. He was becoming a danger to himself and others just by operating a vehicle.

(Doc. 79-15 PageID.1823-1824). Cooper could not predict what days or what time of day his blood sugar would fluctuate. (Doc. 79-1 PageID.874).

Austal's attendance policy provided that eight "occurrences" during a rolling twelve-month period will normally result in termination. An unexcused full day absence counted as one occurrence, an unexcused tardy or early out of two hours or less results in 1/2 occurrence and more than two hours results in one occurrence. Under Austal's policy, after four occurrences a verbal written warning is issued, at six a written warning is issued, at seven a final warning is issued and at eight termination will normally result. An approved leave of absence, vacation, personal time, or any other approved time does not count as an occurrence. During one rolling calendar year, an employee may utilize up to five doctors' notes to excuse

their absences on account of personal illness so that they do not count as occurrences. (Doc. 79-1 PageID.934-935; Doc. 79-5 PageID.1189-1192).

Cooper's supervisor, Leachman, testified that when a Logistics I or II employee like Cooper called "out", he would have to shuffle some employees around and try his best "to look at where are we at in the build and which crib could be shut down" "because if he only had five employees and six cribs, one of them is going to have to be shut down."(Doc. 79-7 PageID.1409). According to Leachman, "we have to be able to react to keep production going" "because we cannot slip on our schedule; it's our promise, you know or their promise to the Government is to stay on track." "We had to keep our crew moving forward," so when "we had to – we had to shut down one for the day." (Doc. 79-7 PageID. 1410-11). When Cooper was out, it had an impact on the team and sometimes Leachman had to "man it" himself.(Doc. 79-7 PageID.1423). Leachman reported that other employees would complain about Cooper being absent. (Doc. 79-7 PageID.1424). Leachman testified that Austal could not run smoothly when Cooper was out "whether it's a short period of time or long period of time," "when I did not know in advance that someone was going to be out, we took a hit." (Doc.79-7 PageID.1427). "We had to pull, you know, talent from one location to move them around" and "when you move talent from one location , that location suffers." (Doc.79-7 PageID.1427-28). "[I]f a location goes a couple of days without a human presence there, it's real bad because now the trades aren't getting what they need. The other employees are not getting what they need,

they're having to go longer distances to get what they need." (Doc.79-7 PageID.1428). "It makes it stressful when you have to constantly keep adjusting without prior knowledge"; "it can put a strain on a lot of folks." (Doc.79-7 PageID.1429). After being absent for a day Cooper could not make up the work because the job needed to be done that day. (Doc.79-7 PageID.1433-34). "When somebody walks to the crib" or cage and "it's empty and it's locked and no one is in there to help them", then "that employee cannot be engaged in work" and has "to go back and find another location that is currently open." "Any delay in supply is a delay in ship" and any time an "employee cannot be fully engaged on that boat working is a loss of time." (Doc. 79-7 PageID.1448). Leachman said he would get frustrated trying to deal with Cooper's unexpected absences and trying to figure out what to do to perform the daily duties each day and not get too far behind – a little behind is going to happen, but he did not want it "to cripple us." (Doc. 79-7 PageID.1452-1453). Willie Thompson, who did the same job as Cooper, states that he "had no problem covering for Mr. Cooper when he was absent" and that covering for Cooper did not make it any more difficult for Thompson. (Doc. 84-12 PageID.2256). Jeremie Raine, who was a Logistics Associate I, reports that some Logistics Associates served as floaters, who had the primary responsibility to fill-in when Logistics Associates were absent. Because the tool cribs inside the Bay were always required to be tended, Austal had employed these floaters and there were always enough floaters to man the tool cribs. Raine also reports that because Austal

5

began automating tool cribs in 2014, employees could check out their own supplies using a badge without a Logistics Associate having to be present. At times Raine had to cover for Cooper, but Raine reports that it was never a hardship filling in for Cooper or other Logistics Associates. (Doc. 84-11 PageID.2253-55).

Cooper had available to him up to 12 weeks of FMLA leave on a rolling calendar-year basis. (Doc. 79-11 PageID.1698). Additionally, Austal provided extended leave of absence ("ELOA") for continuous (block), non-FMLA absences upon a qualifying employee's request. The ELOA leave could not be used intermittently or retroactively to cover attendance occurrences already incurred at the time of the employee request. (Doc. 79-5 PageID.1192, 1260-1261).

In March 2014, Senior Manager of Compensation and Benefits, Deborah Knepton and Human Resources Coordinator, Nick Robertson, met with Cooper to advise him of his low FMLA leave balance (he had used 57.85 days of his allotted 60 days) and that it would not renew until June 11, 2014. At that point Cooper had used five medical-excuse days and had incurred four-and-a-half "occurrences." (Doc. 79-8 PageID.1470-1471, 1536; Doc. 84-5 PageID.20185-2088).

On May 6, 2014, while at work, Cooper passed out and fell because of low blood sugar and injured his wrist. (Doc. 84-28 PageID.2345-2360). Cooper returned to work on May 7, 2014 but Austal would not allow Cooper to work because he did not have a note from his doctor showing that he was cleared to return to work. (Doc. 84-28 PageID.2352). Cooper was evaluated by his doctor on May 7 but received a

half occurrence for being late May 7, 2014. (Doc. 79-5 PageID.1269-1272; Doc, 79-11 PageID.1700). Cooper was absent on May 9, 2014 and received an occurrence. (Doc. 79-1 PageID.909-912). Cooper was absent on May 12-16 and 19, 2014 and called-in to report he would be absent for illness and for FMLA. On June 17, 2014 Cooper obtained certification from his physician that stated he had been treated on May 7, 16, and 17 and that he could return to work on June 19, 2014 and may need to be late or leave early several times a week because of his condition. Regardless of the note from his doctor, Cooper received an occurrence for May 12, 13, 14, 15, 16 and 19, 2014 because those dates were not covered by a personal medical day or PTO and Cooper's 12 weeks of FMLA had been exhausted. (Doc. 79-5 PageID.1259).

On May 20, 2014 Cooper met with HR Coordinator Nick Robertson to request to be off work and was provided with materials to apply for an extended leave of absence or "ELOA." Cooper's request for ELOA was approved as of May 20, 2014 and covered Cooper's leave from May 20, 2014 until June 11, 2014 when his FMLA renewed. ELOA did not cover days prior to May 20, 2014. Cooper used FMLA for leave from June 11 until he returned to work on June 19, 2014. From June 20, 2014 to September 30, 2014 Cooper used FMLA to cover 27 absences. He was absent an additional 28 times between October 1, 2014 and December 31, 2014, utilizing FMLA, PTO and the 5 personal medical days provided by Austal. But Cooper had exceeded his approved time off and was assessed an additional 6.5 occurrences. (Doc. 79-11 PageID.1701).

When Cooper returned to work in July after being out, he was given both a "written warning" and a "final warning" dated July 9, 2014 and he was informed that he had accumulated 9.5 occurrences and that an employee is normally terminated at eight occurrences. (Doc. 84-4 PageID.2065-2067).

From January 27, 2014 to January 27, 2015, Cooper missed all or part of 126 days of work for either FMLA, ELOA, personal illness covered by a medical excuse or for unexcused reasons. The 126 days did not include days Cooper took off as PTO. (Doc. 79-1 PageID 1580-1590).

In January 2015, Cooper's absences were reviewed by HR and it was determined that Cooper had 15 occurrences.[1] On January 27, 2015, Robertson, Lett and Leachman met with Cooper to inform him that his employment with Austal was terminated for his violation of the attendance policy. (Doc. 79-1 PageID.895-897, 958).

## DISCUSSION

### I. Motion to Strike

Austal moves to strike the declarations of Jeremie Raine and Willie Thompson because the EEOC failed to timely disclose these witnesses' identities

---

[1] The Court notes that there is some dispute as to the number of occurrences Cooper should have been assessed under Austal's attendance policy. However, it is clear that Cooper had far exceeded the 8 occurrences allowable under Austal's policy before termination normally results.

and because they contain irrelevant assertions and conclusory allegations not supported by personal knowledge. However, the EEOC reports that they did not become aware of these witnesses, who were former Austal employees, until September 25, 2019, during the deposition of Michael Leachman, Austal's former Logistic Supervisor. The EEOC obtained the declarations from the witnesses on October 3 and 4, 2019 and provided the declarations to Austal on October 4, 2019, before the close of discovery. The EEOC also provided the witnesses names, addresses, and phone numbers in its fourth supplemental disclosure on October 4, 2019. Although discovery closed on that day, Austal could have moved for an extension of discovery if it wanted to depose the witnesses. In light of the above, the Court finds the witnesses were timely disclosed. The Court also finds that the witnesses' statements are not irrelevant, though they do contain some statements that could be viewed as legal conclusions. The Court will consider the declarations only for their factual statements that represent the declarant's personal knowledge. For instance Raine's statement that there "was never a hardship filling in for Mr. Cooper" and Thompson's statement that he "had no problem covering for Mr. Cooper" can only be considered from Raine's and Thompson's personal viewpoints as to how they felt when they had to fill in for Cooper and not as general statements about whether Austal experienced difficulties as a result of Cooper's absences.

Austal moves to strike the December 12, 2013 email from Jeanette Whatley to Chris Blankenfeld because it pertains to a time period not at issue in this action.

The email states that Cooper "did not pass the physical" and attaches a medical report for commercial driver fitness determination which includes a statement that Cooper has diabetes that is poorly controlled, he is consulting with a specialist at UAB, and the following notation: "Type2 diabetes. FBG av. 200-300q AM HGB A1c." The EEOC states that it offers this email only to show that Austal had knowledge of Cooper's diabetes. The Court finds it is proper evidence for that purpose.

Austal moves to strike Jimmy Cooper's medical excuse for December 24 and 29, 2014 as irrelevant. Regardless whether Austal's policy provided that under the circumstances such medical excuses would excuse Cooper's absence for those dates, the Court finds they are relevant to show that Cooper had a medical reason for being absent on those days and had obtained a formal medical excuse to attempt to get those absences excused.

Austal moves to strike the email dated May 29, 2014 from Michael Huey because it contains hearsay and conclusory allegations not supported by personal knowledge. Included in the email is a statement that Austal is not returning Cooper's calls." "The general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment." *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999) (footnote, citation, and internal quotations omitted). The EEOC offers the statement for the truth of the matter stated here. A hearsay statement may be considered on a motion for summary judgment "if the statement could be reduced to admissible evidence at trial or reduced to admissible form." *Id.* at 1323 (citations

and internal quotations omitted). "The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated." FED. R. CIV. P. 56(c)(2) (official commentary 2010 amendment). There must be indications that the declarant, or another witness with personal knowledge, could testify as to the matters stated. *See Robertson v. Interactive Coll. of Tech./Interactive Learning Sys., Inc.*, N2018 WL 3429949, *2-3 (11th Cir. July 18, 2018) (finding an affidavit was properly excluded where affiant testified about a third party's statements because there were no indications that the third party, or anyone else with personal knowledge, was going to testify at trial); *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1294 (11th Cir. 2012) (explaining the possibility that unknown witnesses will emerge to provide testimony was insufficient to make hearsay statements admissible). In this case, the declarant, Michael Huey, has not been identified as a potential witness and even if he could testify at trial, his statement would still constitute hearsay. However, the EEOC asserts that it could have Cooper testify to the facts asserted in the statement. Since Cooper would have personal knowledge his testimony would be admissible. Thus, the Court finds Huey's email should not be stricken.

Lastly, Austal moves to strike the disbarment order for former attorney Dwain Denniston (Doc. 84-39) because it was not produced to Austal during discovery and because it is irrelevant. The disbarment order shows that Denniston, who had advised Cooper regarding a settlement Cooper entered into with Austal,

was disbarred on April 13, 2015.[2]  The EEOC offers the disbarment order to show

that when Cooper entered into the settlement and release agreement on his LHWC

claim, he did not have a real opportunity to consult with an attorney since he

believed Denniston was an attorney. The LHWC settlement was entered into on

April 17, 2015 and Cooper reportedly consulted with Denniston sometime before

entering into the settlement.  The EEOC argues that Denniston's disbarment is not

a surprise to Austal. The EEOC provided Austal with a declaration from Cooper on

May 23, 2019 that stated that Cooper had learned that Denniston could no longer

represent him because of issues with Denniston's law license and that Cooper now

understands that Denniston had been disbarred from the practice of law at the time

he signed the settlement agreements. Additionally, Austal could have questioned

Cooper about this fact when Austal deposed Cooper on September 13, 2019.  In light

of these facts, the Court does not find it necessary to strike the disbarment order.

While its relevance is questionable, the case is not before a jury and the Court is

capable of considering only the relevant portions of the evidence submitted and will

discuss the relevancy of evidence in its analysis.[3]  Accordingly, in light of all of the

above, the Court finds Austal's motion to strike should be **DENIED**.

---

[2] Denniston consented to disbarment based upon allegations that he misappropriated client funds and fraudulently represented that his clients had signed settlement agreements when, in fact, they had not signed the agreements.

[3] Moreover, the Court finds herein that the EEOC's claim fails for reasons unrelated to the settlement. Accordingly, whether Cooper's attorney was disbarred at the time of the settlement is moot.

## II. Motion for Summary Judgment

### A. Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be granted: "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The trial court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "The mere existence of some evidence to support the non-moving party is not sufficient for denial of summary judgment; there must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.' " *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002) (quoting *Anderson*, 477 U.S. at 249). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, at 249-250. (internal citations omitted).

The basic issue before the court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *See Anderson*, 477 U.S. at 251-252. The moving party bears the burden of proving that no genuine issue of material fact exists. *O'Ferrell v. United States*, 253 F.3d 1257, 1265 (11th Cir. 2001). In evaluating the argument of the moving party, the court must view all evidence in the light most favorable to the non-moving party,

and resolve all reasonable doubts about the facts in its favor. *Burton v. City of Belle Glade*, 178 F.3d 1175, 1187 (11th Cir. 1999). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Miranda v. B&B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir. 1992) (citing *Mercantile Bank & Trust v. Fidelity & Deposit Co.*, 750 F.2d 838, 841 (11th Cir. 1985)).

Once the movant satisfies his initial burden under Rule 56(c), the non-moving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." *Howard v. BP Oil Company*, 32 F.3d 520, 524 (11th Cir. 1994) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)). Otherwise stated, the non-movant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment." *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). The non-moving party "may not rely merely on allegations or denials in its own pleading; rather, its response .... must be by affidavits or as otherwise provided in this rule be set out specific facts showing a genuine issue for trial." *Vega v. Invsco Group, Ltd.*, 2011 WL 2533755, *2 (11th Cir. 2011). "A mere 'scintilla' of evidence supporting the [non-moving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citation omitted). "[T]he nonmoving party may avail itself of all facts and justifiable inferences in the

14

record taken as a whole." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 (11th Cir. 1992). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 at 587 (1986) (internal quotation and citation omitted).

## B. EEOC's Claim

The complaint alleges that Austal discriminated against Cooper by failing to provide him leave as a reasonable accommodation and instead terminating his employment for disability-related absences in violation of sections 102(a) and 102(b) of Title I of the ADA, 42 USC §§ 12112(a) and (b)(5)(A). "[A] plaintiff may attempt to establish a claim of illegal employment discrimination through the use of direct evidence, circumstantial (indirect) evidence, or statistics." *Beatty v. Hudco Indus. Prod., Inc.*, 881 F. Supp. 2d 1344, 1351 (N.D. Ala. 2012).

The EEOC asserts that there is direct evidence of disability discrimination. The standard for proving discrimination using direct evidence is as follows:

> The Eleventh Circuit defines direct evidence of discrimination as "evidence which reflects 'a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee.'" *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1358 (quoting *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 641 (11th Cir.1998)). Direct evidence is evidence that, if believed by the trier of fact, "establishes the existence of discriminatory intent behind the employment decision without any inference or presumption." *E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1283 (11th Cir.2000) (quoting *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir.1998)); *see also Burrell v. Bd. of Trs. of*

15

> *Ga. Military Coll.*, 125 F.3d 1390, 1393 (11th Cir.1997); *Kilpatrick v.*
> *Tyson Foods, Inc.*, 268 Fed.Appx, 860, 861–62 (11th Cir.2008).
> Moreover, "only the most blatant remarks, whose intent could mean
> nothing other than to discriminate on the basis of" some impermissible
> factor constitute direct evidence of discrimination. *Rojas v. Florida*,
> 285 F.3d 1339, 1342 n. 2 (11th Cir.2002) (quoting *Schoenfeld v.*
> *Babbitt*, 168 F.3d 1257, 1266 (11th Cir.1999) (citations and quotations
> omitted)); *see Carter v. City of Miami*, 870 F.2d 578, 582 (11th
> Cir.1989). If the alleged statement suggests, but does not prove, a
> discriminatory motive, then it is circumstantial evidence. *Wilson v.*
> *B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir.2004) (citing
> Burrell, 125 F.3d at 1393). Where the plaintiff is able to prove by direct
> evidence that the employer acted with a discriminatory motive, in
> order to prevail the employer must prove, by a preponderance of the
> evidence, that the same decision would have been reached even absent
> that motive. *See Haynes v. W.C. Caye & Co.*, 52 F.3d 928, 931 (11th
> Cir.1995); *Miles v. M.N.C. Corp.*, 750 F.2d 867, 875–76 (11th Cir.1985).

*Beatty*, 881 F. Supp. 2d at 1352. The quintessential example of direct evidence

would be a memorandum from company management directing the termination of

an employee because he is disabled. *See Merritt v. Dillard Paper Co.*, 120 F.3d 1181,

1190 (11th Cir. 1997). The EEOC contends that there is direct evidence of

discrimination because Austal terminated Cooper for 15 attendance occurrences

that resulted from Cooper's disability. However, this evidence does not directly

correlate with an intent to discriminate on the basis of disability. The fact requires

an extra step: it requires the factfinder to infer that Cooper's condition, as opposed

to his lack of attendance, motivated the decision to terminate Cooper.

The EEOC cites two cases[4] to support its contention that being terminated

---

[4] The Court notes that the EEOC cites other cases for general law regarding direct
evidence but cites *Pate* & *Young* to support its specific contention that being
terminated for medical absences is direct evidence of discrimination.

for medical related absences constitutes direct evidence of discrimination: *Pate v. Baker Tanks Gulf South, Inc.*, CV 97-0345, 1198 U.S. Dist. LEXIS 21766, at *3-4 and *Young v. Bank of Bos. Connecticut*, 1995 WL 908616 (D. Conn. Mar. 31, 1995). The Court notes that both of these cases are not in the Eleventh Circuit.

In *Pate*, ultimately the Court actually found that the evidence showed that the defendant did not intend to discriminate against the plaintiff due to her disability and that there was no reasonable accommodation available. *Pate v. Baker Tanks Gulf S., Inc.*, 34 F. Supp. 2d 411, 417-18 (W.D. La. 1999). The court's analysis and conclusion are contrary to the EEOC's position in this case. The *Pate* court stated the following:

> Regular attendance is an essential function of most jobs. *Hypes o/b/o Hypes v. First Commerce Corp.*, 134 F.3d 721, 727 (5th Cir.1998). The law does not require an employer to transfer from the disabled employee any of the essential functions of the job. *Barber v. Nabors Drilling, U.S.A., Inc.*, 130 F.3d 702, 709 (5th Cir.1997). An employee cannot perform the essential functions of a job with reasonable accommodation, if the only successful accommodation is for the employee not to perform those essential functions. *Id.* An accommodation which requires other employees to work harder or longer is not required under the ADA. *Turco v. Hoechst Celanese Corp.*, 101 F.3d 1090, 1094 (5th Cir.1996).
> "[R]easonable accommodation does not require [an employer] to wait indefinitely for [the employee's] medical conditions to be corrected.... " *Rogers v. International Marine Terminals, Inc.*, 87 F.3d 755, 759–760 (5th Cir.1996)(quoting, *Myers v. Hose*, 50 F.3d 278, 283 (4th Cir.1995))(emphasis in original).
> In our previous memorandum ruling, plaintiff presented evidence that she had received a release to return to work from her doctor by February 24, 1995. However, we then noted that if Pate had been incapable of returning to work for the entire length of her recuperation, a different end result might obtain. *See,* October 8, 1998, Memorandum Ruling, fn. 8. Of course, at trial, we found that plaintiff

was not released to return to work until March 26, 1995—five weeks after she first left work. Thus, we are not presented with the situation contemplated in our previous ruling, (i.e. an employee who has been released by her doctor to return to work with restrictions which need accommodation).

As previously found, one of the essential functions of the administrative/dispatch position was regularly being present at the Sulphur office. A consecutive five-week absence does not constitute regular attendance. Without reasonable accommodation, Ms. Pate would not have been able to perform all of the essential functions of the administrative/dispatch job. For the first three weeks, Baker attempted to accommodate Ms. Pate by having temporary help perform her duties. However, the ADA does not require an employer to transfer a disabled employee's duties to another. *Barber, supra*. Even with an accommodation consisting of temporary help, the essential functions of Ms. Pate's job were still not being accomplished. No other reasonable accommodation was identified or suggested by plaintiff.

*Pate*, 34 F. Supp. 2d at 417.

*Young* also does not support the EEOC's position. In *Young*, the defendant had asserted that the plaintiff had produced no evidence that he was "disabled" within the meaning of the ADA. *Young*, 1995 WL 908616 at *6. The court stated that a plaintiff must establish that he either "has a physical or mental impairment that substantially limits one or more of his major life activities", "he is a person with a record of such impairment", or "he is regarded has having such impairment." *Id.* (quoting 42 U.S.C. §§ 12102(2)(A)–(C)). The court found that the plaintiff had established that the defendant company regarded the plaintiff as disabled because "the plaintiff has produced direct evidence in the form of his 1991 evaluation that the defendants regarded him as 'unreliable' due to his medical absences." The 1991 evaluation stated that the plaintiff's "attendance is irregular" and his "reliability is

questionable." *Id.* at *4. The court did not find that this was direct evidence that the plaintiff was discriminated against because of his disability, only that there was evidence that the defendant regarded the plaintiff as having an impairment or disability that caused him to miss work.

The Court's examination of the evidence in the record reveals no direct evidence of disability-based disparate treatment. The EEOC has not identified specific comments or incidents which can be considered unambiguous examples of discrimination. Absent direct evidence of discrimination, Cooper's claims must be examined under the *McDonnell Douglas* burden-shifting framework.[5]

To establish a prima facie case of discrimination under the ADA using circumstantial evidence, the EEOC must prove that:

> (1) [Cooper] is disabled; (2) he was a "qualified individual" at the relevant time, meaning he could perform the essential functions of the job in question with or without reasonable accommodations; and (3) he was discriminated against because of his disability.

*Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001) (citation omitted). "An employer unlawfully discriminates against a qualified individual with a disability when the employer fails to provide 'reasonable accommodations' for

---

[5] Even if the EEOC had presented direct evidence of discrimination, it must still present evidence to establish that Cooper was a qualified individual under the ADA." *Galloway v. Aletheia House*, 509 Fed.Appx. 912, 913-14 (11th Cir. 2013). "A 'qualified individual' is an individual who 'can perform the essential functions' of the desired employment position 'with or without reasonable accommodation.' " *Id.* at 913 (citing 42 U.S.C. § 12111(8)).

the disability—unless doing so would impose undue hardship on the employer." *Id.* (citing 42 U.S.C. § 12112(b)(5)(A) and 29 C.F.R. § 1630.9(a)). "An accommodation can qualify as 'reasonable,' and thus be required by the ADA, only if it enables the employee to perform the essential functions of the job. *Id.* (citation omitted). "The plaintiff bears the burden of identifying an accommodation, and of demonstrating that the accommodation allows him to perform the job's essential functions." *Id.* at 1255-56 (citations omitted). "[E]ssential functions are the fundamental job duties of a position that an individual with a disability is actually required to perform." *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1257 (11th Cir. 2007) (citations and internal quotations omitted).

Austal contends that the EEOC cannot establish a prima facie case because Cooper cannot perform an essential function of the job with or without reasonable accommodation and therefore is not a "qualified individual." Austal asserts that regular attendance at work was an essential function of Cooper's position at Austal. Cooper could not perform his work without being present at work and could not forsee when he would be able to come to work or when he would need to leave early. "The Eleventh Circuit has held that in addition to possessing the required skills necessary to perform the essential job functions, an employee must be able to demonstrate those skills by reporting to work on a regular basis, thereby making attendance an essential function of most jobs." *Russell v. City of Mobile*, 2013 WL 1567372, at *6 (S.D. Ala. Apr. 12, 2013), aff'd sub nom. *Russell v. City of Mobile*

*Police Dep't*, 552 F. App'x 905 (11th Cir. 2014). Austal contends that regular attendance was an essential function of Cooper's position. Whether a function is essential is determined on a case-by-case basis. *Holly*, 492 F.3d at 1257. "[C]onsideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." *Id.* Courts also consider the testimony of the plaintiff's supervisor. *Id.* at 1257-58. (citations omitted). "Also considered are factors such as the amount of time spent on the job performing the function and the consequences of not requiring the employee to perform the function." *Ivey v. First Quality Retail Serv.*, 490 F. App'x 281, 285 (11th Cir. 2012) (citation omitted).

"Prior accommodations do not make an accommodation reasonable." *Id.* (citations omitted). Thus, the fact that Austal allowed plaintiff to take off more time than FMLA required or allowed Cooper to accumulate more occurrences before terminating him does not mean Austal was required to continue to allow Cooper to take off whenever he could not come to work for medical reasons. "The ADA covers people who can perform the essential functions of their jobs presently or in the immediate future." *Id.* (citation omitted). "[A]n employer is not required to accommodate an employee in any manner in which that employee desires." *Id.* (citation omitted).

Here it is undisputed that Austal had in place a detailed attendance policy and that Cooper had to be at work in order to perform his job functions. Cooper's supervisor testified that it is was frustrating and difficult to manage the tool cribs that Cooper worked when he did not know in advance when Cooper was going to be out. Cooper's work had to be performed daily and could not be made up later. The testimony of Cooper's supervisor indicates that when an employee in Cooper's position had frequent unplanned absences, the company suffered. Some of Cooper's co-workers say they had no problem covering for Cooper and report that the tool cribs were sufficiently covered when Cooper was out. But it is clear that Cooper could not perform his job without being present and that his increasing and unpredictable absences was a problem for Austal. Being present was undoubtedly an essential function of Cooper's job, but the question is whether it was essential that Cooper have regular consistent attendance. Where, as here the job must be performed on site and cannot be deferred until a later day, the Eleventh Circuit has found regular attendance is an essential function. As the Eleventh Circuit has stated:

> We previously have held that regular attendance is an essential function of a housekeeping aide job, noting that, "[u]nlike other jobs that can be performed off site or deferred until a later day, the tasks of a housekeeping aide by their very nature must be performed daily at a specific location." *Jackson v. Veterans Admin.*, 22 F.3d 277, 279 (11th Cir.1994); *see also Davis v. Florida Power & Light Co.*, 205 F.3d. 1301 (11th Cir.2000). Similarly, unlike other jobs that can be performed without regard to a specific schedule, the tasks of Appellant's job as store area coordinator by their very nature must be performed daily at a specific time.

*Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1366 (11th Cir. 2000) (finding attendance was an essential function of employee's job and that employee was not a qualified individual with a disability due to her unpredictable tardiness). After considering Austal's detailed attendance policy and the testimony regarding the nature of Cooper's job, the Court concludes that regular attendance is an essential function of Cooper's position.

The next question is whether there was a reasonable accommodation that would have allowed Cooper to perform the essential functions of his job. "A 'reasonable accommodation' may include 'parttime or modified work schedules.' " *Holly*, 492 F.3d at 1257 (quoting *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997)). The problem here is that the evidence establishes that Cooper could not follow any work schedule on a regular basis. There has been no suggestion that changing Cooper's hours or even cutting back on Cooper's hours would alleviate the problem. Cooper's need to take off work was unpredictable. Austal could not be expected to hire an additional employee to be on standby to perform Cooper's duties whenever Cooper could not come in. An employer is not required "to create and fund a position as an accommodation" *Medearis v. CVS Pharmacy, Inc.*, 646 F. App'x 891, 896 (11th Cir. 2016) (citations omitted).

The EEOC contends that it would have been reasonable to grant Cooper additional medical leave. However, additional leave does not solve the problem. As

the Eleventh Circuit has explained:

> Such accommodations do not address the heart of the problem: the unpredictable nature of Jackson's absences. There is no way to accommodate this aspect of his absences. Requiring the VA to accommodate such absences would place upon the agency the burden of making last-minute provisions for Jackson's work to be done by someone else. Such a requirement would place an undue hardship on the agency. *See Guice–Mills v. Derwinski*, 772 F.Supp. 188 (S.D.N.Y.1991), aff'd, 967 F.2d 794 (2d Cir.1992) (where nurse's attendance required, VA under no duty to accommodate unorthodox work schedule).

*Jackson v. Veterans Admin.*, 22 F.3d 277, 279 (11th Cir. 1994); *see also Gore v. GTE S., Inc.*, 917 F.Supp. 1564 (M.D. Ala. 1996) (finding telephone operator with unpredictable absences was not a qualified individual as there was no way to accommodate unpredictable absences). The Court concludes that Cooper was unable to perform the essential functions of his job and that the EEOC has failed to identify any reasonable accommodation that would allow him to perform the essential functions of his job. The Court finds that the EEOC has failed to present evidence that Austal has discriminated against Cooper based on his disability. Accordingly, summary judgment will be granted in favor of Austal.

The Court notes that Austal contends summary judgment should be granted on additional bases, including that the EEOC failed to investigate Cooper's allegations and that Cooper waived his right to recover from Austal by virtue of a settlement agreement. Because the Court found above that the EEOC's claim of discrimination fails, the Court declines to address Austal's other bases.

24

**CONCLUSION**

For the reasons stated above, Defendant's motion to strike (Doc. 87), is

**DENIED**; and Defendants' motion for summary judgment (Doc. 77), is **GRANTED**.

**DONE** and **ORDERED** this 20th day of March, 2020.

/s/ Callie V. S. Granade
SENIOR UNITED STATES DISTRICT JUDGE